Michael Anderson for United Food and Commercial Workers, Local 99. In this case, the district court repeated the error that was corrected in Baca v. Sipes. In a breach of the duty of fair representation case, the district court set itself up as the finder of fact and arbitrator on the grievance presented by the plaintiff, Cheryl Beck. The district court proceeded to hear witnesses credit the plaintiff, discredit the witnesses who testified at trial against her. And the district court disregarded and made no factual findings about the multiple witness statements that were before the union at the time that it decided not to arbitrate. If the law contemplated such a trial de novo of a plaintiff's grievance in a fair representation case, that course would have been appropriate. And on appeal, the union would be relegated to making a very long-shot argument to this court that the district court's demeanor and credibility resolution should be reversed. Okay. Take us through the process here. This is a fair representation claim, right? Breach of duty of fair representation? Correct. What is the showing that needs to be made in a case such as that? In other words, what's the prima facie showing that needs to be made, and then what is the response that puts the case at issue? Well, the plaintiff needs to show that in declining to arbitrate her grievance, that the union acted outside the wide range of reasonableness that the Supreme Court defines. And that judgment cannot be made in hindsight. It is not made from the district court's decision as an arbitrator hearing the witnesses. It is made from looking at the information that was before the union at the time that it made its decision. Now, there are two events that gave rise to Sheryl Beck's termination. In April, the union representative, Barbara Kletner, received a phone call from Sheryl Beck that she was being fired on a charge of profanity. Barbara Kletner immediately scheduled an in-person meeting with the store manager where Sheryl Beck was present. The district court found that going into that meeting, the store manager said that it was his intent to fire Sheryl Beck for what had happened. But as a result of that meeting, Sheryl Beck was not fired. The union demanded to know whether Sheryl Beck had any prior live discipline. That is, anything within the last nine months that would support a progressive discipline ending up in termination. And the answer was no. Sheryl Beck had no prior live discipline. And as a result, Sheryl Beck was not fired. She only received a three-day suspension and a warning. What's more, Sheryl Beck herself, the plaintiff, testified on direct examination that during this meeting, her union representative, Barbara Kletner, specifically pressed the manager for an assurance that she would not be fired even after this warning for, and in quoting the record now, that if she dropped a box on her toe and said, oh, shit, that this would not be grounds for termination. And the manager said, no, of course not. That's ridiculous. What management had at the April meeting, they had not only the statement of the manager who said that Sheryl Beck had abused him, but a statement from a member of the bargaining unit, that is, one of the union's own members who contradicted the group of Sheryl Beck's denial that she had said anything untoward. The union was facing, in effect, a two-to-one credibility dispute. Furthermore, the district court's findings whitewash what it was that Sheryl Beck was being accused of. She was not simply being accused of using four-letter words that indicates oral sex. She was being accused of using that language in the course of direct personal abuse of a manager on store property. And this is something that the district court's findings conceal from you, the reviewing court. The district court simply credited the plaintiff's testimony that she said nothing wrong at all. And again, if the district court were empowered to conduct a trial de novo, we would have a very difficult time arguing that that credibility determination would have to be overturned on appeal. But in assessing what it was that Sheryl Beck was accused of, what two witnesses said that she had said, it makes a very big difference that what she said was not merely profane, not simply that she used a four-letter word, but that she used it in the context of what we would say in constitutional law would be fighting words. It was a direct personal attack on the manager. This makes a big difference in Title VII law, that, for example, if Sheryl Beck had been overheard telling a bawdy joke to a coworker in the break room about, let's say, President Clinton and Monica Lewinsky, the union would have had a much stronger case to take to arbitration if that had been the basis for the three-day suspension. But where that language is used as part of a hostile attack on a coworker, the situation changes. And the district – sorry. Just a quick question. On the April incident, the Court found, I guess based on the testimony of Barbara Kleckner, Ms. Kleckner, that she would have filed a grievance on that incident had she been asked. And he credited Ms. Beck's testimony that, in fact, she did ask. And then based on that, the Court held it was a procedural issue. And then based on its credibility determination or its reading of the witnesses, that the reason that wasn't filed was because of egregious disregard of Ms. Beck's rights. So that doesn't seem to relate to the sorts of underlying factual issues that you're now suggesting to us. Explain how that was an error on the part of the district court. Well, the error as to the filing of the grievance, even taking at face value the credibility determination that Cheryl Beck did, in fact, ask for a grievance to be filed, is that there's no showing of prejudice. That is to say, there's no showing that further grievance proceedings would have made any difference to the information that was before the union. There's no showing that the manager, if he was interviewed in person by the union, would have recanted the statement that was read to the union during that meeting. There's no showing that Ray Garcia, the union member who contradicted the grievance, would have recanted his story. So is your point, excuse me again, but your point is that the grievance, had the union filed, would not have been successful. Is that your suggestion? It would not have developed any more information than was already before the union. If the plaintiff could point to some other witness that the union would have turned up had it pursued a grievance that would have changed the mix of information available to the union, that would be prejudice. But as matters stood, although the union didn't file a piece of paper titled grievance, it did effectively intervene on the plaintiff's behalf. It did immediately schedule a meeting with the store manager. It did prevent her from being terminated. And it did obtain the assurance that the outcome of the written warning would not be that she would be fired simply for saying, oh, shit, and dropping a box on her toe. That may not have been satisfactory to the grievant in the sense that it didn't get every last piece of relief that she would have liked. But the fact remains that the union was still facing a two-to-one credibility conflict. And there's no showing that further investigation in a grievance proceeding would have changed that mix of information before the union. So to move on quickly to what is our standard of review? On appeal, your standard of review is de novo. That is Galindo v. Studi holds that breach of the duty of fair representation determinations are reviewed as a mixed question of law and fact, and your review is de novo. What about all of the factual findings that were made in the course of this trial, bench trial? Well, to the extent that the factual findings are based on assessing the demeanor of witnesses, obviously you defer to the district court. But the errors that matter here are almost without exception errors in the construction of the collective bargaining agreement. And that you review de novo. Legal questions, in effect. Yes. You review that de novo. Moving quickly to the July incident, the July incident for which Cheryl Beck was fired, I note at the outset that if this incident had happened more than nine months after the April warning, management would not have been able to rely on the April warning. If they had relied on Article IIII of the agreement, that warning would have been voided. What the union has in July is it has Cecile Carr, the store secretary, Delano Woods, a union member, Bill Heleneus, a grocery clerk who is upstairs near the room where Cecile Carr and Cheryl Beck were talking. All three of them are saying that Cheryl Beck reduced Cecile Carr to tears with an awful tirade. And the fact that she's using four-letter words in the course of that tirade makes it somewhat worse, but it's not really the point. The point is that Cecile Carr came out of that room crying, asking for Cheryl Beck to just leave her alone. Now, again, if this were before you on a trial de novo, you would have to defer to the district court's credibility resolution that plaintiff did nothing at all, plaintiff was absolutely blameless, and that Woods and Carr and Heleneus are all lying. And there's no question that a fact finder has the power to credit one witness and discredit all the others. Are we looking at what actually happened at the workplace, or are we looking at what was the perception received by the union management in doing it? That is absolutely the latter. We are looking at the information that the union had before it, and that includes written statements provided to it by management. And if you look at it from that perspective and not from hindsight, you're looking at an extremely difficult case to take to arbitration. You're looking at Cecile Carr, the store secretary, two union members, all saying that Cheryl Beck not only used a four-letter word, the district court's focus on that one aspect of the charge misses the bigger picture. It was that, according to Woods and Carr and Heleneus, that Cheryl Beck had reduced her to tears with an intimidating verbal tirade. Now, whether store customers could have heard a four-letter word is not really the point here. The point here is what Cheryl Beck allegedly did to Cecile Carr. Plus, what the union representatives heard or became aware of with respect to that incident, which leads me to my next question, that is, what were the findings of fact made by Judge Carroll with respect to that? In other words, Judge Carroll did not make any findings as to the statements in the record which were not supported by live, in-court testimony. And this reflects the district court's error under Vaca v. Sipes, that you — that in fact, when the union tried to adduce testimony that they had confirmed Ray Garcia's statement discrediting Cheryl Beck, the district court kept that out as hearsay. The statements that are in the record are in the record only because both parties stipulated to them, that apparently the district court didn't find it necessary to address them because the district court apparently considered them to be inadmissible under the Federal rules, which only shows the analytic error that the district court committed. If I can turn to the Title VII issue. We do not argue in this appeal that the union is entitled to any deference in its decision-making to the extent that it's accused of being discriminatory. That is, if a plaintiff does in fact prove that a union commits sex discrimination, Vaca v. Sipes will not protect the union. The error that we complain of in the district court's analysis on disparate treatment is that in every instance, the district court either disregarded the collective bargaining agreement or misrepresented that agreement and its subsidiary grievance settlements. The most important one relates to Larry Molitor. Larry Molitor was suspended in 1989, and then in 2001, when he was in a supervisory position, he was demoted and stripped of his supervisory rank for speaking in much the same way that Sheryl Beck did. And to be clear, we do not argue that what Larry Molitor did is somehow not comparable to what Sheryl Beck did. Both did bad, abusive things. The question is whether what Larry Molitor did in both cases is comparable to Sheryl Beck in April or Sheryl Beck in July. Because if you draw the comparison to Sheryl Beck in April, the case looks very good for the union. Larry Molitor, when he engaged in verbal abuse, was stripped of his supervisory rank and exiled to a store 100 miles away from his home for a period of 16 months. And only after that point did the union ask that he be restored to his original store in Prescott, but it did not ask for his demotion to be rescinded. It only asked for him to be transferred back into a rank-and-file meat-cutter position. That punishment is much harsher than the three-day suspension that Sheryl Beck received in April. The linchpin of the district court's comparison of Molitor and Beck is his finding that Larry Molitor had prior discipline because 12 years earlier he had been given a suspension in 1989 for abusive speech. What that finding disregards is Article 3J of the Union's Collective Bargaining Agreement, which provides that warning notices shall be voided after a nine-month period. And it is not available to a fact finder, even in the course of a Title VII disparate treatment case, to obliterate a negotiated for provision like Article 3J, that this is a gender-neutral provision, that if Sheryl Beck's July incident had happened 10 months later rather than 3 months later, the union would have had a stronger case to take to arbitration against her termination. So is your point that the district court's finding that Sheryl Beck was similarly situated to Mr. Molitor was clearly erroneous? Or are you saying that the district court applied the same the wrong standard under the Title VII in finding discrimination just based on the comparison with Mr. Molitor? We're saying that in making the comparison, the district court committed an error of law in disregarding Article 3J of the contract. But say that that was erroneous to see not to see that one point where they weren't similarly situated. The district court identified a number of other areas in which they were similarly situated. So are you saying that this court would find that the district court's finding was clearly erroneous because of this one area where they weren't similarly situated? Well, if the district court had recognized that Larry Molitor's 1989 suspension was voided by operation of Article 3J, he would have classified Larry Molitor in 2001 as being in the same position as Sheryl Beck in April, not Sheryl Beck in July. And we will stand up to that comparison between Molitor and Beck in April and show you that Beck and Molitor were treated in the same way. It's simply that we're not arguing for clearly erroneous review because the error in disregarding Article 3J is an error of law, just as the district court committed in Rathgeb v. Aircal. That's the case decided by Judge Canby, where a district court found that somebody was not disparately treated based on her sex because she was not eligible for a particular promotion under the collective bargaining agreement. And on appeal, the Ninth Circuit found that, no, she was eligible under the collective bargaining agreement, and it refused to pay clearly erroneous deference to the district court's findings in that respect because the error in the construction of contract was an issue of law, and that error was crucial to the district court's disparate treatment finding. And that's also the case here with Larry Molitor as between whether he should be compared to Beck in April or Beck in July. Your Honor, I am anxious to save the remaining time. You may do so. We'll hear from Ms. Grimwood. May it please the Court. Please introduce yourself for the record. I'm Helen Grimwood, and I'm representing Ms. Beck. The standard of review in this proceeding is very important, of course, to the Court of Appeals and to the review by this Court. The standard of review on the Title VII action, the standard of review with respect to the finding of discrimination under Anderson v. City of Bessemer is a review for clear error. The standard of review with respect to the similarity of Mr. Molitor and Ms. Beck is also a standard of clear error. The case law for all of this is set forth in the briefs. What I'd like to talk about for a moment is the standard of review on the Vacaville-Seib claim. Yes, Your Honor. All right. You're going to go to the other issue. Yes. Thank you. I'll switch now to the Vacaville-Seib fair representation. Fair representation. Yes. Yeah. Because I think that that's the more interesting issue and an important one, at least with respect to the fair representation claim. There has never been a case, and none has been cited, in which a factual finding of discrimination by a trial court has been reversed on appeal by a court of appeals on the grounds that the trial court was supposed to have given deference to a union where the union is found to have been acting in bad faith and subjecting a union member to invidious discrimination under Title VII. It has never happened in the Ninth Circuit, and we have found no case in any other circuit in which that has happened. Let's now unpack that. You remember my colloquy with the appellate counsel. What is our standard of review on what? It seems to me that, arguably, we should be looking at the findings the court made with respect to what the union understood the facts to be rather than what the facts might or might not have been in any event. That would be true, but only if we were looking at a finding of unfair representation where we're dealing with the arbitrariness prong of the Vaca v. Sipes unfair representation claim. When we're dealing with the discrimination prong or the bad faith prong, the cases are uniform that the trial court is supposed to look at discrimination and bad faith under the appellate court is supposed to review the findings of the trial court and that the trial court is supposed to make those findings based on a trial that the trial court conducts. Now, in this case, Judge Carroll found against us on the arbitrariness prong. Judge Carroll, in the very first part of his findings, says, no, it wasn't arbitrary. There was the union did a passable, I can't remember exactly what his words were, but a sufficient investigation so as to withstand a finding of unfair representation based on the arbitrariness prong. So that's not what we're dealing with. What the trial court was dealing with and what we were dealing with and what the Court of Appeals is dealing with now is our factual findings of discrimination and bad faith made after a full trial by the district court judge. Now, it doesn't matter what, I mean, everything was in the record with respect to what was before the union. And the judge found in their favor on that claim, on that prong of the claim. The arbitrariness prong. The arbitrariness claim. The judge found in their favor. Well, now, what's troubling me with this case is that there were a whole bunch of findings made by Judge Carroll, and some had to do with what he, that is, the trial judge, perceived to be what actually happened before the contact was made with the union, and less with respect to what may be the really legally controlling issue, and that is what did the union perceive. Well, what the union perceived is more of an issue with respect to arbitrariness, but we do have sort of a case within a case here. I mean, obviously, the judge has to look at all of the facts and circumstances, not just the facts and circumstances before the union. Of course, those were important to his determination that the union had not, that we lost our arbitrariness claim. But he had to look at the demeanor of the witnesses and all of the facts to determine whether or not this union was in cahoots with Fries, the employer, and was invidiously discriminating against this union member. The only way he could do that was by looking at all of the facts and circumstances, and those were the factual findings that supported the claim of discrimination and bad faith. What is the strongest evidence that the union was in cahoots, as you say, with Fries? The evidence is, of course, we've outlined it in our brief, so I'm just going to be just really cursory here and also in court. That's right. They went to the April meeting, or the meeting on the April incident. There was evidence that the union representative had had conversations that our client didn't know about with Fries in which Fries told her that they were going to, that they were after this woman to fire her. Okay? That's one of the things. She didn't repeat that. The union representative did not share that information with Ms. Beck, contrary to what was stated here a few minutes ago in which they said, well, the union knew about these various statements at that meeting and defended this woman vigorously based on the information that they had. The trial court found that the union said at that meeting, don't show us your statements and we don't have to show you ours. That's what the trial court found. The union had not seen anything that the, that Fries had. The union told Ms. Beck that they were going to proceed with the grievance on the first claim, which was the setup, and they just didn't do it. Failure to even file the grievance. We're not even talking about whether they pursued it. They didn't file it, so they lost that completely. Then they went on and they relied entirely on the statements that management had taken. They wouldn't return her phone calls after months and months and months. When they finally, she filed a claim with the EEOC, and it wasn't until the day that that claim was filed that they did anything to conduct any interviews on their own. And now we're getting into the whole full-blown record at this point. They had the very same month that they were meeting with respect to the so-called profanity used by our client in the parking lot. Mind you, she's a blue-collar worker. There are very, very few women in this workplace. We have testimony that profanity was common. We have specific examples of gross violations of the profanity rule. It was the job of the union to stand up for her, just like they stood up for Larry Molitor when in August they said they argued for his repositioning in the very same store, that he was just a big man with a loud voice, and that profanity was common in the Fry's workplace. We know that the initial setup came out of a conversation where two individuals who had, I mean, a supervisor, yes, they had been dating. They were boyfriend and girlfriend at midnight with no customers present. When Cheryl Beck was off-duty, that was the setup charge. And when it came to trial, the boyfriend didn't even appear as a witness. The union couldn't even get the guy to come forward and repeat what supposedly was said in the parking lot. The only substantiation that the union had that it even happened came from his written statement, and he didn't even appear at trial. What Judge Carroll found was the union was in cahoots with Fry's, and that they were in cahoots to try to drum this woman out. What would be a motive for the union to conduct itself that way? Sex discrimination. That's what the trial court found, sex discrimination, blue-collar workforce, a woman being accused of profanity. The union representative saying, oh, Ms. Beck, well, if you never use profane words, then this isn't going to be a problem for you, is it? On the sex discrimination, the Title VII claim, the district court in the decision, based its decision, it's really solely on the comparison with Larry Molitor and Ms. Reinhold and then a couple of others. I'm troubled by the small size of the group, since that seemed to be the sole basis of the district court's decision, especially in light of our Aragon decision, which says this small of a sample size is simply insufficient. It wasn't a case that was tried on the basis of statistical evidence. And hold on just a second, because actually, I'm going to go back to my slides. Let's see. I have a supplemental citation. It's Cornwell v. Electra, Central Credit Union at 439F3-1018, Ninth Circuit, 2006, decided on March 1st of 2006, which analyzed a case involving a complaint that the numbers of comparators were too small as a basis of circumstantial evidence of discrimination. Counsel, be sure and leave a copy of that citation with opposing counsel and three copies of the page. I will do. And in that case, basically the arguments that the union is making were specifically rejected by the Ninth Circuit. Under Reeves, findings of discriminatory intent can be made on any sort of circumstantial evidence. In this case, Larry Molitor had been in the same store. He was in the same workplace. And it wasn't. It was sex discrimination. I mean, the sex discrimination against Ms. Reinhold, I mean, basically what was happening was that the women, and there were very few of them, were being drummed out based on doing the very same thing that the men were doing regularly. And in the case of Mr. Molitor, it was the profanity, it was the abuse of people in the workplace. In the case of Ms. Reinhold, it was, again, involving Mr. Molitor and others. I think there were three other individuals in addition to where Ms. Reinhold was drummed out for doing the very same thing that they had done. The union, just like they did in this case, did not disclose to Ms. Reinhold the evidence that they had that would have vindicated her with respect to the charges that were made against her. So we're dealing with a workplace, frankly, I mean, there aren't thousands of workers there, but we are seeing an atmosphere of profanity, an atmosphere of not only rough language, but rough conduct that is illustrated very well, and two women drummed out, basically. Counsel, what's your response to Mr. Anderson's point about Molitor not having what's called a live violation? In other words, it was well beyond nine months, and it had not been nullified. Well, it's irrelevant. The fact that it was more than nine months old, I mean, that's not the base. That wasn't a base. We weren't making a claim against him. That comes from the CBA, doesn't it? That comes from the collective bargaining agreement. Yeah, it's true that it couldn't have been pursued, but that's irrelevant. And the judge, by the way, was never asked to interpret. We never asked him to interpret 3I or 3J or any other particular component of the collective bargaining agreement. Our claim was for sex discrimination. And there's nothing in the record, even where the union was basically saying to him, Your Honor, you know, this is a case about 3J. It wasn't. So to the extent that they're arguing that this is a ‑‑ this should be reviewed, that somehow it somehow creates a situation where the judge has made a legal determination. Our claim wasn't on ‑‑ wasn't for an interpretation, what didn't turn on an interpretation of the collective bargaining agreement, other than the fact that the collective bargaining agreement gave our client the right not to be terminated unfairly. So your position is that, nevertheless, he was similarly situated? Yes. Notwithstanding the 9‑month rule? Yes. Well, the 9‑month rule didn't have any bearing on the similarity of his situation. At the very, very time, I mean, what they were doing at the very time that Cheryl Beck was being treated dissimilarly was that they were going to bat for Larry Molitor at meetings where we have handwritten notes in which he was trying to get an improvement of his situation. And the union was going to bat for him. They were getting him moved in spite of all of his prior record, and appropriately, so that's fine that they were trying to get him moved. But they didn't do the same thing for Ms. Beck. They didn't defend Ms. Beck. They didn't use the same arguments that they could have used for Ms. Beck when it had to do with profanity being commonplace in the workplace. And mind you, these are the same union representatives. I mean, we're not talking about a huge group of people here where maybe somebody, you know, forgot or something like that. And the judge did ‑‑ you know, the judge looked at all of that. And he listened to Ms. Kleckner, the union representative. And he found her to be snide. He commented on her demeanor. Snide, is that a legal term in this context? Actually, I think also it's a misquote. But he made specific findings with respect to the demeanor of Ms. Kleckner in ‑‑ and she was the union rep in the way that she was handling the claim on behalf of this blue-collar worker woman who worked at Fry's. Your Honors, I wanted also to point out that this whole business of the standard of review, the first circuit, the sixth circuit, and the eighth circuit, the second circuit, and the seventh circuit have all said that the O'Neill wide range of reasonableness test only applies to arbitrariness claims. And that ‑‑ we've cited Bennett. That's the one from the seventh circuit. We've cited Sanofsky from the second circuit. There's also a case called Carter v. UFCW from the eighth circuit at 963F 2nd 1078, eighth circuit 1992, in which it cites Potter v. Associates from the eighth circuit, Valise v. Puerto Rico from the first circuit, and Perry v. Millionaire from the sixth circuit, all from the same proposition. So if this circuit were to take the view that it must require trial courts to give high deference to unions that exercise their judgment in an invidiously discriminatory way or in bad faith, are allowed to do that. It would be the first ‑‑ it would be the first such opinion. Anything further, counsel? I think that the other thing that you'll find when you look at all of the cases as they line up on this standard of review question, that a lot of them are summary judgment cases. And their summary judgment ‑‑ they're conflating the de novo standard of review on a summary judgment with this other high deference standard that emanates from O'Neill. The high deference standard emanating from O'Neill is the one that I've been talking about. The summary judgment standard is just a regular summary judgment standard in every single case that they cite. The court specifically said, oh, arbitrariness, you're wrong on arbitrariness. That's sort of an objective review. And then they'd say, and by the way, there was no substantial evidence of discrimination or bad faith in this particular case. And that's why those cases went off on summary judgment. There was no substantial evidence of discrimination or bad faith. And those were just ‑‑ those aren't special union cases. Those are just standard, straightforward summary judgment standard review. And that's true of the Berkovitz case. The Galando case was an appeal from an arbitrariness finding. I mean, you can just run these cases through analysis. Thank you, counsel. Your time has expired. Mr. Anderson, you have some reserve time. There's a lot to rebut in all that. First off, there are not very few women in the grocery industry. There's nothing in the record to support the statement you just heard from counsel, and that's not, in fact, true. On the issue of whether the Ninth Circuit reviews claims of bad faith differently than arbitrariness, please read Berkovitz v. Airline Pilots cited in my reply brief. On the April meeting, you heard a litany of indicia of union collusion with management. The one the district court relied on the most was that Barbara Kletner told Sheryl Beck that she had to sign her written warning, otherwise she would be fired. And that was used at the district court as a prime ‑‑ as a prime index of union animus. But what Sheryl Beck misunderstood is that the contract requires employees to sign such a form, not as an admission of liability, but only as receipt of service. And that's on the face of the notice that is Article IIIi of the contract. The district court was not free as a fact finder to incorporate the plaintiff's misunderstanding of the contract and turn it into some kind of a demeanor resolution where he found bad faith by the union on that basis. Finally and most importantly, Article IIIj, the nine‑month rule, is not irrelevant from the union's perspective because it determines what a union can do for someone who's charged with misconduct. If they have live discipline within the last nine months, there is a lot less the union can do at arbitration for them than if they do not. That is why the union was able to stop the termination of Sheryl Beck in April, because she had no live discipline. And the whole case for union collusion with management falls apart once the court recognizes what the district court ignored, that when a worker has live discipline within the last nine months, there is a lot less that the union can do for them than when there is no discipline within the past nine months. That's why if you compare Larry Molitor to Sheryl Beck, please make the appropriate comparison between Larry Molitor to Sheryl Beck in April. And when you make that comparison, you will not find disparate treatment. Thank you, Your Honor. Thank you, counsel. Thank you for a very stimulating oral argument on both sides in this case. The case just argued will be submitted for decision, and the Court will adjourn. All rise. I hereby declare that in all first and second cases, the Honorable United States Court of Appeals Appraiser will not require the District Court of Discussion to stay adjourned.
judges: Hall, O'scannlain, Ikuta